RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MONTGOMERY COUNTY, MARYLAND, et al.

*Petitioners*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION, et al.,

*Respondents*,

UNITED STATES TELECOM ASSOCIATION, et al.,

*Intervenors*.

Nos. 08-3023/15-3578

On Petitions for Review of Orders of the
Federal Communications Commission.
Nos. 07-190; 15-3.

Argued: December 8, 2016

Decided and Filed: July 12, 2017

Before: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Joseph Van Eaton, BEST BEST & KRIEGER LLP, Washington, D.C., for Petitioners. Maureen K. Flood, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. **ON BRIEF:** Joseph Van Eaton, BEST BEST & KRIEGER LLP, Washington, D.C., for Petitioners. Maureen K. Flood, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., Robert B. Nicholson, Robert J. Wiggers, UNITED STATES DEPARTMENT OF JUSTICE, for Respondents. Robert G. Kidwell, Tara M. Corvo, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., Washington, D.C., Bennett L. Ross, Brett A. Shumate, Dwayne D. Sam, WILEY REIN LLP, Washington, D.C., William H. Johnson, VERIZON, Washington, D.C., for Intervenors. James N. Horwood, Tillman L. Lay, SPIEGEL & MCDIARMID LLP, Washington, D.C., for Amici Curiae.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  In this case we have one set of regulators litigating against another.  Over the last ten years, the Federal Communications Commission has published three written orders that together establish a series of rules governing how local governments may regulate cable companies and cable services.  Several local governments have petitioned our court to review the FCC's two most recent orders, arguing among other things that the FCC misinterpreted the Communications Act, 47 U.S.C. § 151 *et seq.*, and failed to explain the bases for some of its decisions.  We agree with some of those criticisms, and thus grant the petition in part and deny it in part.

I.

A.

Our opinion in *Alliance for Community Media v. FCC*, 529 F.3d 763 (6th Cir. 2008), sets forth the relevant history of the Communications Act and cable regulation generally.  In short, the Act regulates the way cable services, which include video programming, reach viewers nationwide.  Under the Communications Act, cable companies may provide cable services only if their local or state governmental authorities (which we call "franchising authorities") grant them a "cable franchise."  47 U.S.C. § 541(b)(1).  But those authorities do not have unlimited discretion in negotiating, granting, and denying franchises.  *See id.* § 541(a)(1).  For example, those authorities may not "grant an exclusive franchise" to any operator, or "unreasonably refuse to award an additional competitive franchise."  *Id.*  And they may not require a cable company to pay a "franchise fee" that exceeds five percent of the company's gross revenues for any 12-month period.  *Id.* § 542(b).

As a condition of granting a franchise, local government authorities may demand, among other things, that a cable operator provide certain services or equipment for public, educational, or governmental purposes.  *See id.* §§ 541(a)(3)-(4), 544(b)(1), 546(c)(1)(D).  In return, some cable operators demand concessions like "most-favored-nation clauses," which allow incumbent

franchisees to adjust the terms of their franchise agreements whenever a competing cable provider secures more favorable contract terms. Once a company has a franchise, it may provide cable services to subscribers via an infrastructure that the Act calls a "cable system[.]" *Id.* § 522(7). Franchises generally expire every ten to fifteen years, at which time the cable companies and franchising authorities can renegotiate. *See id.* § 546; *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 792-93 (1996) (Kennedy, J., concurring in part).

The FCC is authorized to make "such rules and regulations as may be necessary" to carry out the purposes of the Communications Act. 47 U.S.C. § 201(b); *see Alliance*, 529 F.3d at 773-74. Under the Administrative Procedure Act (or APA), the FCC must provide the public with notice of any proposed rule and an opportunity to comment on it. *See* 5 U.S.C. § 553. When the FCC promulgates a final rule, it must also publish a "final regulatory flexibility analysis" responding to the comments and explaining, among other things, the rationale for the rule and its effects on "small entities." *Id.* § 604.

B.

In early 2007, the FCC issued an order establishing several new rules designed to encourage competition in the cable markets by allowing applicants for a cable franchise to get franchises more easily. *See* Implementation of Section 621(a)(1) of the Cable Communications Policy Act, 22 FCC Rcd. 5101 (March 5, 2007) (hereinafter *First Order*). These rules barred franchising authorities from, among other things, imposing unreasonable demands on franchise applicants or requiring new cable operators to provide non-cable services. *Alliance*, 529 F.3d at 771 & n.6. In that same order, the FCC also read narrowly the phrase "requirements or charges incidental to the awarding . . . of [a] franchise" as used in 47 U.S.C. § 542(g)(2)(D), which had the effect of limiting the monetary fees that local franchising authorities can collect from cable operators. Certain local franchising authorities challenged the order on various grounds, but we denied their petition. *See Alliance*, 529 F.3d at 775-87.

Meanwhile, the FCC sought comment on whether it should expand the application of some of the First Order's rules—which applied only to new applicants for a cable franchise—to

incumbent cable providers as well. *See* Implementation of Section 621(a)(1) of the Cable Communications Policy Act, 72 Fed. Reg. 13230-01 (proposed March 21, 2007) (to be codified at 47 C.F.R. pt. 76). In its Second Order, the FCC then expanded the First Order's application as proposed. *See* Implementation of Section 621(a)(1) of the Cable Communications Policy Act, 22 FCC Rcd. 19633 (Nov. 6, 2007) (hereinafter *Second Order*). Various local franchising authorities again objected, and by early 2008 the FCC had received three petitions for reconsideration. The FCC neglected to respond to those petitions for nearly seven years, but finally rejected them for the most part in 2015, in its Order on Reconsideration (which we call the "Reconsideration Order"). *See* Implementation of Section 621(a)(1) of the Cable Communications Policy Act, 30 FCC Rcd. 810 (January 21, 2015). In that order the FCC adhered to the Second Order, with two exceptions. First, the FCC clarified that the Second Order applied to only local (rather than state) franchising processes. *Id.* ¶¶ 6-7. Second, the FCC adopted and published a "Supplemental Final Regulatory Flexibility Act Analysis" as part of the Reconsideration Order to replace the Second Order's analysis, which the FCC conceded was inadequate in some respects. *Id.* at App'x ¶¶ 1-17.

Several local governments and franchising authorities (whom we call the "Local Regulators") then petitioned this court for review of the Second Order and the Reconsideration Order. The United States Telecom Association, National Cable & Telecommunications Association, and Verizon (collectively, the "Intervenors") filed a brief in support of the FCC.

II.

The Local Regulators challenge five aspects of the Second Order and the Reconsideration Order. In some of those challenges, the Local Regulators argue that the FCC interpreted the relevant statutory provisions incorrectly; in others, the Local Regulators argue that the orders were entered in violation of the Administrative Procedure Act. As to the interpretative challenges, if the relevant statutory text is unambiguous, "we give effect to Congress's answer without regard to any divergent answers offered by the agency or anyone else." *Hadden v. United States*, 661 F.3d 298, 301 (6th Cir. 2011). But if the statute is "silent or ambiguous" on the question presented, then we determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* (citation omitted). As for the APA challenges, we

determine whether the agency rules at issue are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662, 667 (6th Cir. 2013) (citation omitted).

A.

The Local Regulators challenge the FCC's interpretation of "franchise fee" as defined by 47 U.S.C. § 542(g)(1). That subsection provides: "the term 'franchise fee' includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such[.]" Section 542(g)(2)(D) separately provides: "the term 'franchise fee' does not include . . . requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages[.]" Requirements or charges that fall within the scope of § 542(g)(2)(D) thus do not count towards the five-percent cap (as measured against a "cable operator's gross revenues" from its provision of cable services) on the franchise fees that the Local Regulators may charge a cable operator. *See id.* § 542(b).

Specifically, the Local Regulators challenge the FCC's inclusion of (i) noncash exactions and (ii) cable-related exactions (as opposed to exactions unrelated to the provision of cable service) in the FCC's interpretation of "franchise fee." By way of background, the FCC stated in its First Order—which again applied only to new applicants for a cable franchise, *i.e.*, "new entrants"—that the incidental "requirements or charges" covered by § 542(g)(2)(D) (and thus not counted toward the five-percent cap for a franchise fee) are only the requirements or charges expressly enumerated in that provision. That order also stated, in relevant part, that "[e]xamples of other items" that do count toward the cap "include application and processing fees that exceed the reasonable cost of processing the application, acceptance fees, free or discounted services provided to an LFA [*i.e.*, local franchising authority], any requirement to lease or purchase equipment from an LFA at prices higher than market value, and in-kind payments as discussed below." *First Order* ¶ 104. The order did not define "in-kind payments"—though, as examples of them, it cited "a request for video hookup for a Christmas celebration and money for wildflower seeds in New York[.]" *Id.* ¶ 107. But the order did conclude that "any requests made

by LFAs that are unrelated to the provision of cable services" are franchise fees that count toward the five-percent cap. The FCC's Second Order then applied its definition of franchise fee to incumbent cable providers as well as to new applicants. *See Second Order* ¶¶ 10-11 & n.32. Finally, in its Reconsideration Order, the FCC stated that its interpretation of "franchise fee" includes all "in-kind payments" regardless of whether they are related to cable services. *See Recon. Order* ¶¶ 11-13.

So now we turn to the challenges themselves. As an initial matter, the FCC and the Intervenors argue that the Local Regulators' challenges to the FCC's inclusion of noncash and cable-related exactions in its interpretation of "franchise fee" are barred by res judicata, because, the FCC says, our court rejected those same challenges in *Alliance*. But there are two problems with that argument. First, the relevant part of our opinion in *Alliance* analyzed (and approved) only the FCC's interpretation of the term "incidental" as used in § 542(g)(2)(D). *See* 529 F.3d at 783. The opinion nowhere analyzed or approved the idea that every cost or expense that a cable operator bears in complying with the terms of its franchise is a "franchise fee" under § 542(g)(1). Hence we have not in fact already decided the issues presented here. *See Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012). Second, the First Order did not make clear that cable-related exactions are franchise fees under § 542(g)(1). Indeed, the FCC itself told us the contrary was true: in opposing a motion to stay its First Order during the pendency of the *Alliance* appeal, the FCC told this court that the First Order's "analysis of in-kind payments was expressly limited to payments that do *not* involve the provision of cable service." *Opposition of Federal Communications Commission to Joint Motion for Stay Pending Judicial Review*, 2007 WL 2041325, at *14 n.16 (emphasis in original). And for good reason: the First Order rather pointedly concluded that exactions "*unrelated* to the provision of cable services" are franchise fees, *First Order* ¶ 105 (emphasis added), which yields a plain negative inference that, so far as the First Order was concerned, exactions that *are* related to the provision of cable services are *not* franchise fees. The FCC responds that this interpretation of its First Order renders its reference to "free or discounted services" in ¶ 104 of the Order superfluous in light of the FCC's reference in the same paragraph to "in-kind payments as discussed below." But that assumes that these (undefined) terms have some objectively discernable meaning as used in the Order—which they do not. The FCC's current (as opposed to

prior) interpretation of the First Order on this point is therefore plainly erroneous.  *See In re AmTrust Fin. Corp.*, 694 F.3d 741, 754 (6th Cir. 2012).

Thus we turn to the merits of the two challenges.  First, the Local Regulators and their *amici* argue that noncash exactions are not "franchise fees" under § 542(g)(1)—because that section defines franchise fees as a "tax, fee or assessment[,]" and those things are almost always monetary in nature.  But § 542(g)(1) more specifically defines "franchise fee" to include "*any* tax, fee, or assessment *of any kind*[,]" (emphasis added), which requires us to give those terms maximum breadth.  And the terms "tax" and "assessment," in particular, can include nonmonetary exactions.  The definition of "tax," for example, includes "a burdensome charge, obligation, duty, or demand."  *The Random House College Dictionary* 1347 (rev. ed. 1982); *see also Black's Law Dictionary* 106-07 (5th ed. 1979) ("[a]n enforced contribution of money *or other property* . . . [or] *any contribution* imposed by government upon individual, for the use and service of the state" (emphasis added)).  And Justice Scalia, for one, has recognized that assessments need not be monetary—by referring to "in-kind assessments[,]" which closely tracks the FCC's usage of the phrase "in-kind payments" here.  *See Austin v. United States*, 509 U.S. 602, 623-24 (1993) (Scalia, J., concurring); *Recon. Order* ¶ 11.  Thus we conclude that "franchise fee" as defined by § 542(g)(1) can include noncash exactions.

That the term "franchise fee" can include noncash exactions, of course, does not mean that it necessarily *does* include every one of them.  The Local Regulators argue that "franchise fee" does not include "in-kind" cable-related exactions in particular.  On that point the Local Regulators offer two contentions, one substantive and one procedural.  The substantive argument is that the FCC's interpretation of franchise fee would undermine various provisions of the Act that allow or even require the Local Regulators to impose cable-related obligations as part of their cable franchises.  For example, the Local Regulators may require "that channel capacity be designated for public, educational, or governmental [or "PEG"] use," and that "channel capacity on institutional networks [or "I-Nets"] be designated for educational and governmental use[.]" 47 U.S.C. §§ 531(b), 541(b)(3)(D).  And the Local Regulators must "assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides[,]" *id.* § 541(a)(3)—a

mandate that often brings with it expensive "build-out" obligations for cable operators. *See Alliance*, 529 F.3d at 771 n.6. The Local Regulators assert that, if the costs of these requirements count toward the five-percent cap, the Regulators will not be able to impose these requirements in the first place, thereby thwarting Congress's intent in enacting these provisions.

The FCC's Second Order and Reconsideration Order do not reflect any consideration of this concern, which leads to the Local Regulators' second contention: that those orders contain scarcely any explanation at all for the FCC's decision to expand its interpretation of "franchise fee" to include so-called "in-kind" cable-related exactions. We agree with that contention. The Second Order says nothing at all in support of this expansion. And the Order on Reconsideration merely asserts that its First Order had already treated "in-kind" cable-related exactions as franchise fees, and that our court had approved that treatment in *Alliance*. *See Recon. Order* ¶¶ 11-13. As explained above, however, both assertions are wrong. Thus, the FCC has offered no explanation as to why the statutory text allows it to treat "in-kind" cable-related exactions as franchise fees. The FCC likewise has offered no explanation as to why the Local Regulators' structural arguments are, as an interpretive matter, incorrect. And apart from a fleeting reference in the Reconsideration Order, the FCC has not even defined what "in-kind" means.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Thus, if an agency wants the federal courts to adopt (much less defer to) its interpretation of a statute, the agency must do the work of actually interpreting it. The FCC's orders reflect none of that work as to the question whether "in-kind" cable-related exactions are "franchise fees" under § 541(g)(1). We therefore vacate, as arbitrary and capricious, the orders to the extent they treat "in-kind" cable-related exactions as "franchise fees" under § 541(g)(1). On remand, the FCC should determine and explain anew whether, and to what extent, cable-related exactions are "franchise fees" under the Communications Act. And the FCC should do so expeditiously, rather than take another seven years to issue a proper order under the law.

B.

The Local Regulators next challenge the FCC's so called "mixed-use" rule, which in essence states that local franchising authorities can regulate only the provision of cable services over "cable systems" as defined by the Act. *See Second Order* ¶¶ 16-17; *see also* 47 U.S.C. § 522(7).

By way of background, the infrastructure that supports cable services—which the Act refers to as "cable systems"—can also support at least two other kinds of services: "telecommunications services[,]" such as telephone service offered directly to the public, and "information services[,]" such as certain internet add-on applications and other ways to make information available via telecommunications. *See generally* 47 U.S.C. § 153(24), (53); *In the Matter of Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5614-15 (2015). The Act also makes clear that local franchising authorities can regulate so-called "Title II carriers" (basically, providers of phone services) only to the extent that Title II carriers provide cable services. *See* 47 U.S.C. § 522(7)(C).

The Local Regulators' biggest concern about the mixed-use rule—and the biggest indicator, in their view, that the rule is wrong—is that it apparently would prevent them from regulating so-called "institutional networks," or "I-Nets." Institutional networks provide various services to non-residential subscribers, rather than just video services to residential subscribers (which is all that the mixed-use rule seems to allow local franchising authorities to regulate). *See id.* § 531(f). Yet the Act makes clear that local franchising authorities can regulate I-Nets. *See id.* §§ 531(b); 541(b)(3)(D).

The FCC now concedes that its mixed-use ruling was not meant to prevent local franchising authorities from regulating institutional networks. And that concession, the Local Regulators say, resolves "90 percent" of their concern about the mixed-use rule. But that still leaves a dispute about whether local franchising authorities can regulate other services, like "information services" as defined by 47 U.S.C. § 153(24). Thus we turn to the merits of the Local Regulators' challenge.

The Communications Act bars franchising authorities from regulating the "services, facilities, and equipment provided by a cable operator except to the extent consistent with" the Act. *Id.* § 544(a). The Act in turn permits authorities to impose various franchise requirements to the extent that those requirements are "related to the establishment or operation of a cable system[.]" *Id.* § 544(b) (emphasis added). Section 522(7) defines a "cable system" as "a facility . . . that is designed to provide cable service," including video programming, "to multiple subscribers within a community[.]" *Id.* § 522(7).

The Local Regulators admit that the FCC's mixed-use decision is "defensible as applied to Title II carriers," since the Act expressly states that local franchising authorities may regulate Title II carriers only to the extent they provide cable services. *See id.* § 522(7)(C). And as a practical matter that was how the FCC applied the mixed-use rule in the First Order, since that order concerned new entrants to the cable market, most of whom apparently were Title II carriers. *See First Order* ¶¶ 22, 39, 118, 121 (indicating that new entrants generally are "local exchange carriers" (LECs) or other telephone companies); *see also MetroPCS California, LLC v. FCC*, 644 F.3d 410, 411, 412 (D.C. Cir. 2011) (describing LECs and noting that they are common carriers). Understandably, then, the FCC invoked § 522(7)(C) as the statutory basis—indeed as the only statutory basis—for its decision to apply the mixed-use rule to new entrants. *See First Order* ¶¶ 121-23 & nn.401-04.

Where the trouble began, in the Local Regulators' view, is in the FCC's Second Order, which applied the mixed-use rule to incumbent cable operators—most of whom are not Title II carriers, and thus to whom § 522(7)(C) does not apply. The FCC's statutory basis for the mixed-use rule in the First Order, therefore, does not by its terms support the FCC's extension of the mixed-use rule to incumbent cable operators in the Second Order. Yet the FCC chose not to cite any other statutory basis for its application of the mixed-use rule to incumbent providers in the Second Order. *See Second Order* ¶¶ 16-17.

Instead, the FCC merely relied on the First Order's statutory interpretation of § 522(7)(C), noting that § 522 "does not distinguish between incumbent providers and new entrants." *Id.* But that reasoning is not an affirmative basis for the FCC's decision in the Second Order to apply the mixed-use rule to incumbent cable operators. Section 522(7)(C) by its terms

applies only to Title II carriers.  And many incumbent cable operators are not Title II carriers.  Nor does the Reconsideration Order offer any statutory explanation for the FCC's decision; instead that order merely "adhere[s]" to the Second Order on this point.  *Recon. Order* ¶ 15.

In sum, the FCC's orders offer no valid basis—statutory or otherwise—for its application of the mixed-use rule to bar local franchising authorities from regulating the provision of non-telecommunications services by incumbent cable providers.  Thus, on the record now before us, the FCC's extension of the mixed-use rule to incumbent cable providers that are not common carriers is arbitrary and capricious.  *See Teva Pharm. USA, Inc. v. Food & Drug Admin.*, 441 F.3d 1, 5 (D.C. Cir. 2006).  We therefore vacate the mixed-use rule as applied to those incumbent cable operators, and remand for the FCC to set forth a valid statutory basis, if there is one, for the rule as so applied.

C.

We make shorter work of the Local Regulators' remaining three arguments.

1.

The Local Regulators argue that the FCC should have preempted, in its Second Order, so-called "most-favored-nation" ("MFN") clauses in franchise agreements.  By way of background, in the First Order the FCC invalidated so-called "level-playing-field" rules, which were state or local rules that barred franchising authorities from granting new cable franchises on terms that were better than those in existing franchise agreements.  *See First Order* ¶ 138.  The FCC also forbade franchising authorities from unreasonably denying a new franchise based on an applicant's inability to meet certain excessive requirements.  For example, franchising authorities could not require "a franchisee [to] deploy cable services to all households in a given franchise area" within an unreasonably short timeframe.  *Alliance*, 529 F.3d at 771 & n.6.  In the Second Order, the FCC recognized that these parts of the First Order might permit some "competitive providers to enter markets with franchise provisions more favorable" than incumbent cable providers, and thus might trigger the application of some MFN clauses.  *Second Order* ¶ 20.  But the FCC saw no reason to invalidate those clauses themselves.  *Id.*; *see also Recon. Order* ¶¶ 8-10.

According to the Local Regulators, the FCC's decision to strike down the level-playing-field rules while leaving the MFN clauses in place will create a downward spiral that the Regulators rather vaguely say is "inconsistent" with the Act. The downward spiral, as the Local Regulators see it, has two steps. In the first step, the First Order will cause new entrants to obtain better terms than incumbent operators have. In the second step, the incumbents' MFN clauses will entitle them to those better terms. The Local Regulators assert that this cycle would repeat with each new franchise granted, causing a downward spiral and eventually preventing authorities from making reasonable demands of franchisees.

The theory presumes that the First Order effectively requires franchising authorities to give every new wave of cable providers a better deal than the last. But the First Order does not do that. Instead it merely *allows* franchising authorities to give better terms to new entrants if they so choose, so long as the authorities impose only reasonable requirements. Meanwhile, nothing prevents franchising authorities from refusing to agree to MFN clauses when incumbent franchises come up for renewal. *See Second Order* ¶ 20; *Recon. Order* ¶¶ 8-10. Nor have the Local Regulators provided any evidence, as opposed to speculation, that the FCC's decisions in this area will somehow thwart Congress's intent as expressed by the Act's plain terms. Moreover, analysis of these kinds of market dynamics is primarily the FCC's province, not ours. *See Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 260-61 (D.C. Cir. 2007). Nor, suffice it to say, was the FCC's decision on this point arbitrary and capricious in any way. Hence we reject this challenge to the FCC's orders.

2.

The Local Regulators next argue that the FCC should make clear that the Second Order does not bind state franchising authorities (as opposed to local ones). But the FCC has already made that clear, by expressly stating that the Second Order was "intended to apply only to the local franchising process, and not to franchising laws or decisions at the state level." *Recon. Order* ¶ 7.

Still, the Local Regulators worry about the following footnote in the Reconsideration Order:

> Nothing in this *Order on Reconsideration*, of course, changes the fact that in litigation involving a cable operator and a franchising authority, a court anywhere in the nation would be required to apply the FCC's interpretation of any provision of [the Communications Act] that would be pertinent (e.g., [47 U.S.C. § 542]), including those interpretations set forth in the *First Report and Order* and *Second Report and Order*.

*Id.* ¶ 7 n.33 (citing, for example, *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014)). According to the Local Regulators, this footnote would require a district court to apply the First and Second Orders in any case where, for example, a prospective new entrant claims that the relevant franchising authority has imposed unreasonable conditions on the new entrant in violation of § 541(a)(1). And some of those cases might involve state franchising authorities, in which case, the Regulators seem to fear, a district court (per the footnote) might think itself bound to apply the FCC's First and Second Orders to the state authority. The Local Regulators thus assert that the Reconsideration Order is internally inconsistent and therefore arbitrary and capricious. *See Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 768 (6th Cir. 1995).

The Local Regulators misread the footnote, which merely makes the jurisdictional point that district courts cannot review the substantive validity of the FCC's orders. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *see also Mais*, 768 F.3d at 1119. And part of the substance of the First and Second Orders themselves, per the express terms of the First and Reconsideration Orders, is that they do not apply to state franchising authorities. *See First Order* ¶ 126; *Recon. Order* ¶ 7. Hence a district court could not disregard that limitation either.

Moreover, the FCC's decision not to regulate, and thus to leave a gap in its regulatory regime, is not arbitrary and capricious. Agencies may "proceed one step at a time[.]" *Cincinnati Bell Tel. Co.*, 69 F.3d at 767. And the FCC has offered to undertake a future rulemaking, if requested, to consider whether its orders should apply to state-level franchises. *See Recon. Order* ¶ 7. Hence this challenge, to the extent it is one, is meritless.

3.

Finally, the Local Regulators argue that the FCC's Supplemental Final Regulatory Flexibility Analysis (which it attached to the Reconsideration Order) was defective because it putatively failed to meet the "purely procedural" requirements of the Regulatory Flexibility Act. *See Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (alteration and citation omitted). Under the Act, an agency must publish, for each rule that it promulgates, a "final regulatory flexibility analysis" that assesses the rule's effects on "small entities" and describes any steps the agency has taken to "minimize the significant economic impact" on them. *See* 5 U.S.C. § 604. We review these analyses to ensure only that the agency made a "reasonable, good-faith effort" to comply with the requirements of § 604. *See Zero Zone, Inc. v. United States Dep't of Energy*, 832 F.3d 654, 683 (7th Cir. 2016) (gathering cases).

Here, the FCC identified specific comments that raised the same objections that the Local Regulators now raise in the petition. And the FCC explained that, in its view, its rules in the relevant orders would "not impose a significant impact on any small entity" because the FCC "did not disturb many portions of the existing franchise requirements, such as MFN clauses, build-out requirements, time limits for franchise negotiations or customer service laws." *Recon. Order* at App'x ¶ 16. The agency's analysis of the relevant orders' effects upon small entities was procedurally adequate. *See Nat'l Tel. Co-op. Ass'n*, 563 F.3d at 540. And to the extent that the Petitioners argue that the FCC's regulatory analysis made its other rules arbitrary and capricious, we have dealt with those arguments above.

\*      \*      \*

We grant the petition in part, deny it in part, and remand to the agency for further proceedings consistent with this opinion.