RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITY OF EUGENE, OREGON (19-4161); CITY OF PORTLAND, OREGON, et al. (19-4162); STATE OF HAWAII (19-4163); ALLIANCE FOR COMMUNICATIONS DEMOCRACY, et al. (19-4164); ANNE ARUNDEL COUNTY, MARYLAND, et al. (19-4165); CITY OF PITTSBURGH, PENNSYLVANIA (19-4166); CITY OF CHICAGO, ILLINOIS, et al. (19-4183),

> Nos. 19-4161/4162/4163 /4164/4165/4166/4183

*Petitioners,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents,*

NCTA - THE INTERNET & TELEVISION ASSOCIATION (19-4161–4166/4183); CITY OF NEW YORK, NEW YORK, et al. (19-4162); BLOOMFIELD TOWNSHIP, MICHIGAN, et al. (19-4165); CITY OF AURORA, COLORADO, et al. (19-4183),

*Intervenors.*

---

On Petitions for Review from an Order of the Federal Communications Commission.
Nos. 05-311 and 19-80.

Argued: April 15, 2021

Decided and Filed: May 26, 2021

Before: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Tillman L. Lay, SPIEGEL & MCDIARMID LLP, Washington, D.C., Cheryl A. Leanza, BEST BEST & KRIEGER LLP, Washington, D.C., for Petitioners. Maureen K. Flood,

FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Jessica Ring Amunson, JENNER & BLOCK, LLP, Washington, D.C., for Intervenor NCTA. **ON BRIEF:** Tillman L. Lay, James N. Horwood, Jeffrey M. Bayne, SPIEGEL & MCDIARMID LLP, Washington, D.C., Cheryl A. Leanza, Joseph Van Eaton, Gerard Lavery Lederer, BEST BEST & KRIEGER LLP, Washington, D.C., Gail A. Karish, BEST BEST & KRIEGER LLP, Los Angeles, California, Michael R. Bradley, Vincent Rotty, Michael Clarke Athay, BRADLEY LAW, LLC, Woodbury, Minnesota, Michael J. Watza, KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK, Detroit, Michigan, Daniel S. Cohen, Joel S. Winston, COHEN LAW GROUP, Pittsburgh, Pennsylvania, Kenneth S. Fellman, KISSINGER & FELLMAN, P.C., Denver, Colorado, Brian T. Grogan, MOSS & BARNETT, Minneapolis, Minnesota, for Petitioners and Intervenors. Maureen K. Flood, Jacob M. Lewis, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., Robert B. Nicholson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Jessica Ring Amunson, Howard J. Symons, Ian Heath Gershengorn, Elizabeth B. Deutsch, JENNER & BLOCK, LLP, Washington, D.C., for Intervenor NCTA. Elina Druker, NEW YORK CITY OFFICE OF THE CORPORATION COUNSEL, New York, New York, for Intervenors City of New York, et al.

––––––––––––––––

**OPINION**

––––––––––––––––

KETHLEDGE, Circuit Judge. Over the past 15 years, the Federal Communications Commission has published a series of written orders that, together with Title VI of the Communications Act ("the Act"), 47 U.S.C. § 521 *et seq.*, set forth rules by which state and local governments may regulate cable providers. Numerous local governments have petitioned for review of the FCC's most recent order, arguing that the FCC misinterpreted the Act. We grant the petitions in part and deny them in part.

I.

Our opinion in *Alliance for Community Media v. F.C.C.*, 529 F.3d 763 (6th Cir. 2008), sets forth the relevant history of the Communications Act and cable regulation generally. In brief, a cable operator may provide cable services only if a franchising authority—usually a local body, but sometimes a unit of state government—grants the operator a franchise to do so. *See* 47 U.S.C. §§ 522(9), 541(b)(1). In exchange for a cable franchise, franchising authorities often require (among other things) that cable operators pay fees, provide free cable service for public

buildings, and set aside channel capacity for "public, educational, and governmental [referred to in the industry as 'PEG'] use[.]" *See, e.g.*, *id.* §§ 541(a)(4), 542(a). Some of those requirements count as "franchise fees," which the Act limits to five percent of a cable operator's gross revenues for cable services for any 12-month period. *See id.* § 542(b). The costs of franchise fees, of course, are passed on to cable subscribers. *See id.* § 542(c), (e).

In 2007, the FCC issued an order (the "First Order") in which it read narrowly one of five exceptions to the Act's definition of franchise fee. The First Order also announced the FCC's "mixed-use rule," under which franchisors could not regulate the non-cable services of cable operators who were "common carriers" under Title II of the Act. Various franchising authorities challenged that order, but we denied their petition. *See Alliance*, 529 F.3d at 775-87.

The FCC later issued another order (the "Second Order"), in which the FCC interpreted the term "franchise fee" to include all noncash (or "in kind") exactions required by a franchise agreement, with the exception of exactions falling within a statutory exception to the Act's definition of franchise fee. Historically some of those exactions were unrelated to cable services, such as a demand by St. Louis that a cable operator contribute 20 percent of its stock to the city. Other exactions were cable-related, such as requirements for free cable service to public buildings. Under the Second Order, the value of those exactions counted toward the franchise-fee cap. *See* Implementation of Section 621(a)(1) of the Cable Communications Policy Act, 22 FCC Rcd. 19633 (Nov. 6, 2007). The Second Order also extended the "mixed-use rule" to "incumbent" cable operators, who for the most part were not common carriers under Title II.

Again various franchising authorities petitioned for review of the FCC's conclusions. We agreed with the FCC that the term "'franchise fee' as defined by § 542(g)(1) can include noncash exactions." *Montgomery County. v. F.C.C.*, 863 F.3d 485, 491 (6th Cir. 2017). But we held that the FCC had not explained why, under the Act, *every* cable-related noncash exaction counted as a franchise fee. We likewise held that the FCC had not offered a statutory basis for its application of the mixed-use rule to incumbent cable operators. We therefore vacated those determinations and directed the FCC to set forth a statutory basis for them. *Id.* at 492-93.

The FCC did that in its Third Order, which it entered in 2019. *See* 84 Fed. Reg. 44,725-01 (Aug. 27, 2019). In that Order, the FCC analyzed various sections of the Act, and concluded that most—though not all—cable-related noncash exactions are franchise fees. *See id.* ¶ 8. The FCC likewise explained its reasoning as to why the Act does not allow franchising authorities to regulate the non-cable services of cable operators who are not common carriers. *See id.* ¶¶ 64-70, 73-77. Finally, the FCC extended its rulings to state (rather than just local) franchising authorities, reasoning that the Act makes no distinction between them. *See id.* ¶ 114.

Various franchising authorities petitioned for review of the Third Order in various circuit courts, which in turn transferred those petitions to this circuit. The petitioners moved for a stay of the Third Order during the pendency of this appeal, which we denied. We now adjudicate the petitions themselves.

## II.

The petitioners challenge the Third Order on multiple grounds. In most of those challenges, the petitioners argue that the FCC interpreted the relevant statutory provisions incorrectly; in others, the petitioners argue that the orders were entered in violation of the Administrative Procedure Act. As to the interpretive challenges, absent some insuperable ambiguity, "we give effect to Congress's answer without regard to any divergent answers offered by the agency or anyone else." *Montgomery County*, 863 F.3d at 489 (cleaned up). There is no such ambiguity here. As for the APA challenges, we determine whether the agency rules at issue are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

### A.

#### 1.

Several of the petitioners' challenges concern the FCC's interpretation of the term "franchise fee" as defined by 47 U.S.C. § 542(g). The first is directed at the FCC's conclusion that most (though not all) noncash cable-related exactions count as franchise fees subject to the five-percent cap. Those exactions are often substantial. Prior to the FCC's ruling, for example,

a franchise agreement in Montgomery County, Maryland required the cable operator there to provide "courtesy Basic and Expanded service" to an ever-growing number of public buildings—totaling, in 2018, "898 complimentary accounts with an estimated value of $949,000 annually[.]"  A franchise agreement in another locality required the cable operator to provide free cable service to "three golf courses, an ice arena, a municipal pool, an airport, a park activity center, a historical society and museum, a community college, and a water treatment plant." (The petitioners respond that, in both cases, the provision of these free services was negotiated.)

Section 542(g)(1) provides in full:  "the term 'franchise fee' includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such[.]"  That this definition comprises "'*any* tax, fee, or assessment of *any* kind[,]'" we held in *Montgomery County*, "requires us to give those terms maximum breadth."  863 F.3d at 490.  Moreover, this language makes no distinction between noncash exactions that are not cable-related (which in *Montgomery County* we held can be franchise fees) and noncash exactions that are.  Hence the question here is why noncash cable-related exactions should be categorically excluded, as Petitioners argue, from the definition of franchise fee.

In *Montgomery County*, we observed, the petitioners had made a serious argument as to why noncash cable-related exactions should be excluded from that definition—namely, that doing so "would undermine various provisions of the Act that allow or even require [franchising authorities] to impose cable-related obligations as part of their cable franchises." *Id.* at 491.  In the Third Order, however, the FCC offered a nuanced response to that argument.  The Act itself imposes (or requires that franchising authorities impose) certain cable-related obligations upon cable operators.  For example, § 541(a)(3) provides that "a franchising authority *shall assure* that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides" (emphasis added)—a mandate, as we noted in *Montgomery County*, "that often brings with it expensive 'build-out' obligations for cable operators."  863 F.3d at 491.  Section 541(a)(2)—which provides that "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements"—likewise makes clear that those costs of

construction shall "be borne by the cable operator" (or by its subscribers). And § 552(b) provides that "[t]he Commission shall . . . establish standards by which cable operators may fulfill their customer service requirements." (In our view those standards are not a "tax, fee, or assessment" in the first place, and hence fall outside the franchise-fee definition altogether.) The Act itself, rather than a franchise agreement, imposes these obligations on cable operators. The FCC therefore concluded that network "build-out costs" and costs related to FCC-imposed "customer service requirements"—along with PEG "capital costs[,]" which the Act expressly excludes from the franchise fee definition, *see id.* § 542(g)(2)(C)—are not franchise fees. Hence they do not count toward the five-percent cap. *See Third Order* ¶¶ 38-40, 57-58.

But other noncash cable-related exactions are not mandated by the Act. For example, § 531(b) provides that "[a] franchising authority *may* in its request for proposals require as part of a franchise . . . that channel capacity be designated for [PEG] use[.]" (Emphasis added.) That same subsection likewise provides that a franchising authority "*may* require" that "channel capacity on institutional networks"—or "I-Nets," which provide various services to non-residential subscribers, *see id.* § 531(f)—"be designated for educational or governmental use." Relatedly, § 541(b)(3)(D) provides that a franchising authority "*may*" require a cable operator to provide "institutional networks" as a condition of a cable franchise. And nobody disputes that a franchising authority may—but need not—require the cable operator to provide free cable service to government or other public buildings. But whether to require any of these things—or to require free service to a handful of buildings, or 898—is up to the franchising authority.

Thus, the Act makes a distinction between obligations that the Act itself imposes and obligations that a franchising authority may choose to include in a franchise agreement as a matter of negotiating discretion. Only the latter count as franchise fees. We therefore agree with the FCC that, under the statutory text and structure, noncash (or "in-kind") cable-related obligations mandated by the Act are not franchise fees. But noncash cable-related exactions (including I-Net exactions) that the Act merely permits a franchising authority to impose are franchise fees under § 542(g) and thus count toward the five-percent cap.

Petitioners' remaining arguments on this point are insubstantial. Petitioners invoke § 542(c), which allows cable operators to identify as separate line items on subscriber bills "the amount of the total bill assessed as a franchise fee" and the amount of the bill assessed "to satisfy any requirements imposed on the cable operator . . . to support [PEG][.]" Those separate line items, Petitioners contend, would amount to a "deceptive billing practice" if PEG costs were already included in the amount of the franchise fee. But PEG "capital costs" are expressly excluded from the definition of franchise fee, *see id.* § 542(g)(2)(C), which means that some PEG costs are not franchise fees. True, there is some overlap between the two items; but Congress could have wanted subscribers to know the amount of their bills that is attributable to public, educational, and governmental channels as a stand-alone expense. The inference that Petitioners seek to draw from § 542(c) is therefore weak. (For substantially the same reasons, we reject Petitioners' nearly identical contention with regard to § 543(b)(2)(C).) Moreover, § 542(c) allows a cable operator to identify franchise fees and PEG costs as separate line items only to the extent consistent with "regulations prescribed by the Commission[,]" which is protection enough against deceptive billing practices.

Petitioners also invoke § 546(c)(1)(D), which directs franchising authorities—when reviewing a cable operator's proposal to renew a franchise—"to consider" whether the proposal "is reasonable" to meet the community's cable-related needs, "taking into account the cost of meeting such needs and interests." Petitioners say they would have no need to "consider" the costs of noncash cable-related exactions if they already needed to tally up those costs as part of the five-percent cap. As an initial matter, this provision is practically hortatory, and hence a flimsy basis for structural inferences. Moreover, as shown above, some noncash cable-related exactions are not franchise fees, which means this provision is not surplusage. Nor, as the Petitioners seem to assume, is the five-percent figure a floor on the costs that local franchisors may impose under a franchise agreement. Instead it is a ceiling, below which franchisors should "consider" the utility of each cost they choose to impose on cable operators and (by extension) subscribers.

We likewise reject Petitioners' argument that the Third Order in any way contradicts § 542(i), which provides that a federal agency may not regulate the manner in which a

franchising authority uses funds collected as franchise fees. The Third Order does not do that: it clarifies what counts as a franchise fee under § 542(g), and otherwise allows franchisors to use as they wish the monies they lawfully collect. Petitioners' interpretive arguments with respect to noncash cable-related exactions are without merit.

Finally, we reject summarily Petitioners' various arguments that the FCC was arbitrary and capricious as to the manner in which it issued its determination that noncash cable-related exactions are franchise fees. For the reasons already stated, the FCC amply explained the statutory bases for that interpretation. Moreover, we have no authority to set aside a correct interpretation of the statutory text in favor of the "reliance interests" invoked by Intervenor New York City. And as far back as 2007—when the FCC issued the Second Order—the FCC advanced largely the same interpretation of franchise fee (with respect to noncash cable-related exactions) that it advances now. Fourteen years later, nobody can claim unfair surprise. Nor do we see any basis for Petitioners' complaint that the FCC disregarded public safety in the Third Order. To the contrary, the FCC expressly addressed public safety in the Order, *see Third Order* ¶ 107, and acknowledged that PEG and I-Nets facilitate "reporting on local issues," like public emergencies. *Id.* ¶¶ 50, 55. But the FCC properly concluded that those public-safety benefits cannot "override" the Act's text. *Id.* ¶ 55.

In sum, we reject Petitioners' challenge to the FCC's determination that noncash cable-related exactions are franchise fees under § 542(g).

2.

Petitioners have a point, however, as to the standard by which noncash cable-related exactions should be assigned a monetary value for purposes of counting them toward the five-percent cap on franchise fees. In the Third Order, the FCC provided an administrative answer to that question but not an interpretive one. Specifically, in a single paragraph of analysis—and without any reference to the Act's text—the FCC said that noncash cable-related exactions should be assigned their "market value" for purposes of the five-percent cap. The reason, in the FCC's view, was that the market value of these exactions "is easy to ascertain[,]" because "operators have rate cards to set the rates that they charge customers[.]" *Third Order*

¶ 61. The FCC also observed that, absent these exactions, the franchising authority "would have no choice but to pay the market rate for services it needs from the cable operator or another provider." *Id.*

But the FCC has its payors mixed up. Franchisors do not "pay" franchise fees; cable operators do. *See* 47 U.S.C. § 542(a). A franchisor's replacement cost is therefore beside the point. And a cable operator does not "pay" the hypothetical profit that it would have obtained had it sold its services to a paying customer (as opposed to providing those services gratis to a franchisor). Nor, presumably, could a cable operator pass through to subscribers—as a "franchise fee"—its hypothetical profit on services it provides to franchisors. *See id.* § 542(c), (e). Not a word in § 542 supports the notion that franchise fees can be a source of profit for cable operators.

Meanwhile, § 542 does refer to the "costs of the franchise fees" paid by cable operators. *Id.* § 542(d). And a cable operator does, in a meaningful sense, "pay" the out-of-pocket costs it incurs when providing noncash cable-related services pursuant to a franchise agreement. Those costs affect the operator's bottom line precisely as a monetary exaction would. And—as the FCC itself made clear in its Third Order—the Act provides no reason to treat cash and noncash exactions differently. On this point, therefore, we grant the petitions and hold that, for purposes of § 542(b), noncash cable-related exactions should be assigned a value equal to the cable operator's marginal cost in providing them.

B.

1.

Petitioners next challenge the so-called "mixed-use rule," which concerns the extent to which the Act bars franchising authorities from regulating non-cable services provided by cable operators. The "rule" itself is not set forth in the Act; instead, the rule is the FCC's synthesis of the Act's preemption clause and various limitations that Title VI places upon franchisors' regulatory authority. Under the mixed-use rule, as described by the FCC, a franchising authority may not regulate the non-cable services of a cable operator "except as expressly permitted in the Act." *Third Order* ¶ 64. And that express permission, the FCC believes, is something the Act

almost never grants. *See* 47 C.F.R. § 76.43 ("A franchising authority may not regulate the provision of any services other than cable services offered over the cable system of a cable operator, with the exception of channel capacity on institutional networks.").

Petitioners argue that the mixed-use rule does not follow from the Act's terms. To a significant extent we agree with them: the Act nowhere states or implies that franchisors may regulate cable operators only as "expressly permitted in the Act." *Accord City of Dallas v. F.C.C.*, 165 F.3d 341, 348 (5th Cir. 1999). What the Act does say, in § 544(a), is that a "franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent *consistent with* this subchapter." (Emphasis added.) And the Act's preemption clause recites, not coincidentally, that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is *inconsistent with* this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c) (emphasis added). (Although Petitioners suggest otherwise, the "subchapter" referenced in § 544(a) is obviously part of the "chapter" referenced in § 556(c).)

The relevant question as to preemption, therefore, is not whether the Act itself authorized a franchisor's action. Indeed, the awkward, negative formulation of § 544(a)—that the franchisor "may not" regulate cable operators "except to the extent consistent with" Title VI, as opposed to saying simply that franchisors "may regulate" cable operators to that extent—suggests that Congress went out of its way *not* to suggest that federal law is the fountainhead of all franchisor regulatory authority. What we know from §§ 544(a) and 556(c), rather, is that federal law circumscribes the franchisors' authority as to cable operators. The relevant "rules" as to the preemption of state or local actions are the rules stated in those provisions. The FCC's formulation, respectfully, only gets in the way.

The question presented, therefore, is simply one of preemption; and §§ 544(a) and 556(c) tether the preemption analysis to the terms of the Act itself. Vague references to a "bargain" between cable operators and franchisors, *Third Order* ¶ 84, are thus beside the point. Instead, the test for preemption under those provisions is whether state or local action is "inconsistent with" a

specific provision of the Act. "Inconsistent" means, most concisely, "incompatible." *Am. Heritage Dictionary* at 914-15 (3d ed. 1992). The Act therefore preempts actions that violate or circumvent any of its provisions. *See Verizon North, Inc. v. Strand*, 309 F.3d 935, 941 (6th Cir. 2002) (affirming preemption of a state order that "completely bypasses and ignores the detailed process for interconnection set out by Congress in the [Act]"); *Verizon North, Inc. v. Strand*, 367 F.3d 577, 585 (6th Cir. 2004) (affirming preemption of a state order that "eliminates all incentive to adhere to the federal statutory process"). Thus, on this point, we agree with the FCC's conclusion that "states and localities [may] not 'end-run' the Act's limitations by using other governmental entities or other sources of authority to accomplish indirectly what franchising authorities are prohibited from doing directly." *Third Order* ¶ 81.

2.

a.

With that framework, we turn to the preemption question here. That question itself requires some definition. In *Montgomery County*, we held that "franchising authorities may regulate Title II carriers only to the extent they provide cable services." 863 F.3d at 492 (citing 47 U.S.C. § 522(7)(C)). For practical purposes that proposition was common ground in that case: the petitioners there, to their credit, did not dispute that, "to the extent the Title II common carrier facility is *not* used to provide cable services, the facility is *not* a cable system." Pet'r Br. at 47, *Montgomery County. v. F.C.C.* (No. 15-3578). That proposition follows inescapably from § 522(7)(C), which provides in relevant part that "[t]he term 'cable system' . . . does not include . . . a facility of a common carrier which is subject, in whole or in part, to the provisions of [Title II], except that such facility shall be considered a cable system . . . to the extent such facility is used to" provide cable services.[1]

---

[1]We reject the argument by certain petitioners here that § 522(7)(C) excludes from the definition of a "cable system" only "the *portion*" of a common carrier's facility that is used to provide telecommunications services. Portland Br. at 51. The "extent" to which a facility is a "cable system" under § 522(7)(C) does not depend on which *wires* are used to provide cable service; instead it "depend[s] on the service [the facility is] providing *at a given time*." *MediaOne Grp., Inc. v. County of Henrico*, 257 F.3d 356, 364 (4th Cir. 2001) (emphasis added).

But in *Montgomery County* we remanded to the FCC the question whether the Act bars franchisors from regulating the non-cable services of cable operators "who[] are not Title II carriers." 863 F.3d at 493. Here, that question is part of a concrete dispute regarding the validity of a fee that the City of Eugene, Oregon imposes on broadband services (which the FCC classifies as an "information service" under the Act, *see* 33 FCC Rcd. 311, 321 (Jan. 4, 2018)) provided by a cable operator there. Hence we answer that question to the extent it is part of that dispute here.[2]

b.

The Eugene Code states that any "operator"—cable or not—that provides "telecommunications services" over the city's rights-of-way must pay "a fee in the amount of 7% of the licensee's gross revenues derived from telecommunications activities within the city, to compensate the City for the use of the rights-of-way." Eugene City Code §§ 3.410, 3.415(2). The Eugene Code defines "telecommunication activities" to include three different kinds of services under the Communications Act: cable services, telecommunications services, and information services. *See id.* § 3.005; 47 U.S.C. § 153(24), (53).

Here, nobody disputes that, as applied to cable operators, Eugene's seven-percent fee on cable revenues is capped at five percent by operation of the Act's cap on franchise fees. *See* 47 U.S.C. § 542(b); Eugene City Code § 3.415(4). The question, instead, is whether Eugene's fee on broadband services is "consistent with" Title VI as applied to a cable operator that is not a common carrier. 47 U.S.C. § 544(a). In the Third Order, the FCC concluded that such a fee, so applied, was inconsistent with Title VI on two grounds: first, the FCC determined, the fee is a franchise fee that (when added to the five-percent fee on cable revenues) is imposed in violation of the franchise-fee cap in § 542(b); and second, the FCC determined, the fee amounts to regulation of a cable operator's provision of information services, which is proscribed by § 541(b). We address those determinations in turn.

---

[2]We do not address, however, the question whether a state or local government (as opposed to a franchising authority) may impose a fee on *telecommunications* services provided by cable operators. The question whether a fee of that sort would circumvent Title VI's limits on franchisor regulation of a cable operator's telecommunications services is neither fully briefed nor clearly presented on the facts here.

(i)

Section 542(g)(1) provides: "the term 'franchise fee' includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, *solely because of their status as such*[.]" (Emphasis added.) Thus, if the Eugene fee is imposed on a cable operator "solely because of [its] status" as a cable operator, then the fee is a "franchise fee" and hence invalid under § 542(b) (assuming that the operator has already paid a fee equal to five percent of its gross revenue from cable services).

Section 522(5) defines "cable operator" and provides in full:

> the term "cable operator" means any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system[.]

Of all the words in this definition, the FCC's argument focuses relentlessly on two: "management" and "operation." By way of background, everyone agrees that "Congress was well aware that 'cable systems' would be used to carry a variety of cable and non-cable services." *Third Order* ¶ 88. The "management or operation of a cable system[,]" *id.*, thus includes the operation of a cable system to provide broadband services. Thus, in the FCC's view, the conduct giving rise to the imposition of Eugene's fee—namely, an operator's use of the right of way to provide broadband services—falls within the § 522(5) definition of "cable operator." Hence, the FCC concludes, the Eugene fee on broadband services is imposed on a cable operator "solely because of [its] status as such." *See id.* ¶ 91.

But the FCC reads "management and operation" woefully out of context. Indeed, all the contextual indicators cut against the FCC's interpretation. As an initial matter, the franchise-fee cap itself is based only on revenues from "cable services." 47 U.S.C. § 542(b). True, Congress can define however it wants the fees that count toward that cap. But one would normally expect that the fees that count towards a revenue-based cap would be fees on the same kind of revenue used to set the cap itself—here, revenue from "cable services."

Section 522(5)(A) bears out that expectation, given that it defines a "cable operator" to be a person who "provides cable service over a cable system" and "owns a significant interest in such cable system." A fee imposed on such a cable operator "based on [its] status as such[,]" *id.* § 542(g)(1), would be a fee based on the provision of "*cable service* over a cable system," *id.* § 522(5)(A). Thus, so far as § 522(5)(A) is concerned, the fees that count toward the § 542(b) cap are fees on the same revenues used to set the cap itself—namely, revenue from "cable services." *Id.* §§ 522(5)(A), 542(b). The City of Eugene's fee on broadband services, of course, is not such a fee.

Yet the FCC's interpretation would yield a radically different result if a cable operator "otherwise controls" the cable system rather than "owns" it. For the FCC overlooks a host of words that Congress "careful[ly] cho[se]" to include in § 522(5). *Third Order* ¶ 89. The first is "owns": as noted above, if the cable operator "owns" the cable system over which it "provides cable service[,]" the only fees that are imposed "based on [its] status as such"—and thus the only fees that count as franchise fees under § 542(g)(1)—are fees on revenues from the operator's provision of "cable service[.]" 47 U.S.C. § 522(5)(A). Again, the City of Eugene's fee on the provision of broadband services is not such a fee. Even under the FCC's interpretation, therefore, Eugene's fee on broadband services—as imposed on a cable operator that owns its cable system, which is presumably most of them—is *not* a "franchise fee" that counts toward the § 522(b) cap.

But the same is not true, under the FCC's interpretation, if the cable operator "*otherwise* controls" the cable system. *Id.* § 522(5)(B). (Emphasis added.) "[O]therwise[,]" as used in § 522(5)(B), plainly distinguishes control of the cable system by "own[ership]"—which is governed by § 522(5)(A)—from control by some *other* "arrangement"—which is governed by § 522(5)(B). And only § 522(5)(B) references an operator's "management and operation" of a cable system. Under the FCC's interpretation, therefore, only under § 522(5)(B) does a person's "operation" of a cable system—which can include the provision of broadband services—give rise to the person's status as a "cable operator." Only as to cable operators as defined under § 522(5)(B), therefore, would the City of Eugene's fee on broadband services be imposed on the operator "based on [its] status as such." *Id.* § 542(g)(1). Only as to those operators, therefore,

would Eugene's fee on broadband services be a "franchise fee" that counts toward the § 542(b) cap.

The FCC's interpretation thus leads to a distinction that makes no apparent sense: Eugene's fee on broadband services *is* a "franchise fee" as imposed on cable operators who do not own the cable system over which they provide broadband services; but is *not* a "franchise fee" as imposed on cable operators who do own the cable system over which they provide broadband services. Not even the FCC argues otherwise—because it simply elides the distinction between "owns" and "otherwise controls" in § 522(5).

In fact, however, the FCC's interpretation is mistaken altogether. For the FCC also overlooks some other words in § 522(5)—namely, "such cable system" and "such a cable system[.]" *Id.* § 522(5)(A), (B). Section 522(5)(A) refers to a cable operator "who provides cable service over a cable system" and who "owns a significant interest in such cable system." "[S]uch cable system[,]" as used there, refers to a particular cable system—namely, *the* cable system over which the operator "*provides cable service*[.]" Section 522(5)(B), in turn, refers to a cable operator who "otherwise controls . . . the management and operation of such a cable system." "[S]uch a cable system," as used there, refers to the same *type* of system described in § 522(5)(A)—namely, a cable system over which the operator *provides cable services*. *Cf. AES-Apex Employer Servs., Inc. v. Rotondo*, 924 F.3d 857, 864 (6th Cir. 2019). The two subsections therefore do not create radically different rules for operators who "own[]" a cable system and operators who "otherwise control[]" one. *Id.* § 522(5)(A), (B). Instead, read as a whole, the two subsections ensure that both kinds of cable operators are treated the same.

What gives a person the status of a cable operator under § 522(5), therefore, is the person's provision of cable services. And the City of Eugene's fee on broadband services, by definition, is not imposed based on the operator's provision of cable services. The fee is therefore not imposed "solely because" of a cable operator's "status as such[.]" Hence the fee is not a "franchise fee" under § 542(g)(1); the fee does not count toward the § 542(b) cap; and its imposition is not, on that ground, "inconsistent with" Title VI. *Id.* § 556(c).

(ii)

But the FCC also determined that the City of Eugene fee on broadband services—as applied to a cable operator that is not a common carrier under Title II—is inconsistent with § 544(b)(1) and thus preempted on that ground. By way of background, as noted above, Congress undisputedly contemplated that cable operators would use their facilities to provide both cable and non-cable services. For example, § 544(a) provides that "[a]ny franchising authority may not regulate the *services*, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter." (Emphasis added.) That reference to "services" notably is not limited to cable services.

Section 544(b)(1) in turn provides that a franchising authority, "in its request for proposals for a franchise . . . may establish requirements for facilities and equipment, but may not . . . establish requirements for video programming or other information services[.]" Likewise undisputed here is that "information services," as used in § 544(b)(1), includes broadband services. Under § 544(b)(1), therefore, a franchising authority cannot require payment of an information-services fee as a condition of obtaining a franchise under § 541(b)(1). Meanwhile, § 541(a)(2) provides that "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way[.]" Section 541(b)(1) also makes clear, albeit by implication, that a franchise shall be construed to allow the cable operator to operate the cable system.

A franchising authority in the City of Eugene therefore could not, consistent with § 544(b)(1), impose on a cable operator a seven-percent broadband fee as a condition for a cable franchise. The question, then, is whether the City circumvented that limitation when it imposed the same fee on a cable operator by means of the City's police power.

We conclude that it did. The power of a franchisor *qua* franchisor, as explained above, is the power to grant (or deny) access to public rights-of-way to construct and operate a cable system. 47 U.S.C. § 541(a)(2), (b)(1). The City (or its franchisor) exercised that power when it granted a cable operator there a franchise under § 541(b)(1). In doing so, the City granted the cable operator the right to use its cable system, including—as Congress plainly anticipated—the

right to use that system to provide information services.  The City also surrendered its right to exclude the cable operator from the City's rights-of-way.  Yet the City imposes a seven-percent "license fee" upon the same cable operator to use the same cable system on the same "rights-of-way."  Eugene City Code § 3.415(2).

As applied to the cable operator, therefore, the City's imposition of a "license fee" equal to seven percent of the operator's revenues from broadband services is merely the exercise of its franchise power by another name.  And § 544(b)(1) expressly barred the City from exercising its franchise power to that end.  *See Liberty Cablevision of P.R., Inc. v. Municipality of Caguas*, 417 F.3d 216, 221 (1st Cir. 2005) (holding that "the municipalities' attempts to assess fees for use of these same rights-of-way are inconsistent with the [Act] and are necessarily preempted").  The City's imposition of its broadband fee on the cable operator therefore circumvents "the Act's limitations by using other governmental entities or other sources of authority to accomplish indirectly what franchising authorities are prohibited from doing directly."  *Third Order* ¶ 81.  Thus, the fee is not "consistent with" Title VI and is therefore preempted.  47 U.S.C. §§ 544(a), 556(c).

Petitioners respond that the fee is rescued by § 544(b)(2)(B), which provides that a franchisor "may enforce any requirements contained within the franchise . . . for broad categories of video programming or other services."  But that provision refers only to provisions that a franchisor and cable operator agree upon as part of a franchise agreement.  And a fee imposed by legislative fiat is hardly that.  (Nor do we think it clear that the reference to "other services" in § 544(b)(2)(B) includes "information services."  Although we need not decide the issue here, the "other" in "other services" might distinguish the services referenced in § 544(b)(2)(B) from the "information services" mentioned in § 544(b)(1).)  The FCC is therefore correct that, as applied to a cable operator that is not a common carrier, the City of Eugene's fee on broadband services is preempted.

C.

We make shorter work of Petitioners' remaining two arguments.

1.

Petitioners argue that the FCC's extension of its determinations in the Third Order to state (as opposed to local) franchisors was arbitrary and capricious. With respect to that extension, the FCC reasoned that it saw "no statutory basis for distinguishing between state- and local-level franchising actions." *Third Order* ¶ 113. Neither do we: section 544(a) provides that "*[a]ny franchising authority*" may not regulate a cable operator "except to the extent consistent with this subchapter." (Emphasis added.) Section 556(c) likewise provides that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter," is preempted. Petitioners thus argue in essence that the FCC was bound to adopt a distinction that Congress expressly rejected. Nor was the FCC obligated, as Petitioners suggest, to catalogue the effect of its entirely lawful extension upon particular state laws or provisions. Petitioners' arguments are without merit.

2.

Finally, Petitioners seek to challenge the FCC's determination that a cable operator may challenge in court any request for PEG support that is "more than adequate[,]" as the term "adequate" is used in § 541(a)(4)(B). *Third Order* ¶ 49. Suffice it to say, however, that no party has remotely presented this issue in a concrete form justiciable under Article III. *See Sierra Club v. E.P.A.*, 793 F.3d 656, 662 (6th Cir. 2015); *Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002).

\*   \*   \*

For the reasons stated above, the petitions are granted in part and denied in part.